UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Auto-Owners Insurance Company,  File No. 18-cv-02143 (ECT/SER)

    Plaintiff,

v.

Laura Kammerer and Frank Kammerer,  **OPINION AND ORDER**

    Defendants,

and

J.M., a minor, through her mother and natural guardian, Jacqueline Macha,

    Intervenor Defendant.

---

Gerald H. Bren and Olivia A. Moe, Fisher Bren & Sheridan, LLP, Minneapolis, MN, for plaintiff Auto-Owners Insurance Company.

Matthew J. Barber, Alicia N. Sieben, James S. Ballentine, Schwebel Goetz & Sieben, P.A., Minneapolis, MN, for intervenor defendant J.M.

---

This case is about insurance coverage for injuries from a dog bite. The answer to the coverage question depends on whether a term appearing in the relevant policy in bold text—"**insured**"—means the same thing or something different when it appears in the policy in plain text—"insured." Plaintiff Auto-Owners Insurance Company says the word unambiguously has the same meaning regardless of whether it appears in bold or plain text and that, as a result, there is no coverage for dog-bite injuries sustained by intervenor defendant J.M. J.M. says the opposite, and she has intervened and moved to dismiss

Auto-Owners' complaint under Federal Rule of Civil Procedure 12(b)(6). J.M.'s motion will be granted because the Auto-Owners policy is at least ambiguous about whether it uses the word "insured" to mean different things depending on whether it appears in bold or regular text, and Minnesota law requires that ambiguity to be construed against Auto-Owners. Auto-Owners' complaint for declaratory relief based on its interpretation of the policy is therefore implausible.

I

The facts of this case are few and straightforward. Defendants Laura and Frank Kammerer asked J.M. to care for their two dogs while the Kammerers were away. Compl. ¶¶ 8–11 [ECF No. 1]. J.M. was caring for the dogs in the Kammerers' home on December 31, 2016, when one of them bit her multiple times, causing injuries. *Id.* ¶¶ 12–13. At that time, the Kammerers were covered under the Auto-Owners homeowners policy, and the policy provided personal-liability protection. *Id.* Ex. B ("Policy") at 9, 25–30 [ECF No. 1-2].

The Kammerers notified Auto-Owners of the incident on January 3, 2017. Compl. ¶ 13; *id*. Ex. A [ECF No. 1-1]. On April 26, 2018, J.M.'s attorney sent a demand letter to Auto-Owners. *Id.* ¶ 14. Auto-Owners sent the Kammerers a "reservation-of-rights" letter on June 28, 2018. *Id.* Ex. C [ECF No. 1-3]. In the letter, Auto-Owners wrote that it would defend the Kammerers against J.M.'s claims subject to a reservation of rights but added: "Please be advised that the Auto-Owners Policy does not apply to '**bodily injury** or **personal injury** to any insured.' If Claimant is an **insured** under the Policy, then no coverage exists under the Policy." *Id.* at 1, 6 (bold text in original). (The letter's reference

to "insured" in plain text in the first quoted sentence followed by its reference to "**insured**" in bold text in the second presaged the central issue in this case.)  Auto-Owners filed this case in July 2018 against the Kammerers seeking a declaration under the federal Declaratory Judgments Act, 28 U.S.C. § 2201, that the policy does not cover J.M.'s claim.[1] *See* Compl. ¶¶ 18–22; *id*. at 6.  J.M. intervened by stipulation and then moved to dismiss for failure to state a claim.

II

A

Several settled legal rules govern consideration of J.M.'s Rule 12(b)(6) motion and interpretation of the policy.  The complaint's factual allegations and reasonable inferences from those allegations must be accepted as true.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Parties agree that Minnesota law controls interpretation of the policy, and this makes sense.  The case is in federal court on the basis of diversity.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64,

---

[1] Though the Declaratory Judgments Act does not itself provide federal jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950), there is subject-matter jurisdiction over the case pursuant to 28 U.S.C. § 1332(a)(1).  The adverse Parties are completely diverse.  Auto-Owners is a Michigan citizen, and the Kammerers and J.M. are Minnesota citizens.  Compl. ¶¶ 2–3, 13; *id*. Exs. A, C.  And "the value of the object of the litigation," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977), from the viewpoint of every Party is greater than $75,000, exclusive of interest and costs.  *See* Compl. ¶ 14; *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Maune*, No. 4:05 CV 2021 JCH, 2006 WL 587650, at *1–2 (E.D. Mo. Mar. 10, 2006) (discussing the amount-in-controversy requirement in the context of a declaratory-judgment action involving an insurance policy).

78 (1938). The policy was issued in Minnesota, and no relevant fact is alleged to have occurred outside Minnesota. Under Minnesota law, "[g]eneral principles of contract interpretation apply to insurance policies." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) (citation omitted). "Interpretation of an insurance policy is a question of law. Unambiguous language is given its plain and ordinary meaning. Ambiguous language is construed against the insurer. While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *C.S. McCrossan Inc. v. Fed. Ins. Co.*, No. 16-cv-3379, 2018 WL 2180256, at *7 (D. Minn. Mar. 29, 2018) (cleaned up) (quoting and citing *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006)); *see also 3M Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 858 F.3d 561, 566 (8th Cir. 2017).

B

There is no dispute about which parts of the policy matter. The Parties identify the same four provisions in their briefs:

- *First*, the policy has a "**DEFINITIONS**" section that begins with this two-sentence explanation: "To understand this policy, **you** must understand the meaning of the following words. These words appear in **bold face type** whenever used in this policy and endorsements attached to this policy." Policy at 14.

- *Second*, relative to "**Coverage E – Personal Liability**," the policy says: "**We** will pay all sums any **insured** becomes legally obligated to pay as damages because of or arising out of **bodily injury** . . . caused by an **occurrence** to which this coverage applies." *Id.* at 25.

- *Third*, for purposes of "**Personal Liability**" coverage, the policy defines "**insured**" to mean, not just the Kammerers, but also "any person . . . legally responsible for animals . . . owned

4

> by [the Kammerers].  However, **we** will cover that person . . . only with respect to those animals." *Id.* at 14–15.

- *Fourth*, the policy contains an exclusion—known commonly as an "intra-insured" exclusion—that reads: "**Coverage E – Personal Liability** does not apply . . . to **bodily injury** . . . to any insured." *Id.* at 27–28. (Note that "insured" appears in this exclusion in plain text, and that creates the issue.)

*See* Mem. in Supp. at 2–3 [ECF No. 15]; Mem. in Opp'n at 4–5 [ECF No. 18].

The coverage issue in this case—and the scope of the Parties' dispute—is narrow. All agree J.M. sustained a "**bodily injury**" caused by an "**occurrence**" within the policy's coverage. Everyone also agrees that J.M. was "legally responsible" for the Kammerers' two dogs when she cared for them, making her an "**insured**" under the policy's "**Personal Liability**" coverage, but "only with respect to those animals."[2] The Parties disagree—and the dispositive issue in this case is—whether J.M. is an "insured" for purposes of the "**Personal Liability**" intra-insured exclusion. Auto-Owners argues that J.M. "is an insured as used in [the] exclusion because the Policy unambiguously defines insured to include any person legally responsible for the Kammerers' covered animals." Mem. in Opp'n at 2. Auto-Owners describes the word's appearance in the exclusion in plain text as "what appears to be [a] typographical error" and argues "that typographical detail does not change the meaning of the defined term under the Policy." *Id.* J.M. argues that the policy

---

[2] The purpose of this provision seems straightforward. If J.M. walked the Kammerers' dogs, for example, and if one of the dogs bit another individual, say a child playing in the vicinity, the policy would cover J.M. against claims arising from that situation "only with respect to" the dogs. Policy at 15.

5

unambiguously intended the word "insured" to have different meanings depending on whether it appeared in bold or plain text. Mem. in Supp. at 1–3.

C

The policy reasonably may be construed to cover J.M.'s claim. The "**DEFINITIONS**" section says explicitly that words in "**bold face type**" have the policy-specific meanings given them in that section. Policy at 14. The necessary corollary is that words in the policy that are not in "**bold face type**"—even words defined by the **DEFINITIONS** section—do not have a policy-specific meaning. Authorities on this precise point seem scarce, but some conclude persuasively that words appearing in plain text unambiguously do not share a policy-specific or specialized meaning assigned to words in bold text. *See, e.g.*, *Certain Underwriters at Lloyd's v. LM Ericsson Telefon, AB*, 272 S.W.3d 691, 696–97 (Tex. Ct. App. 2008) ("But we do not think any reasonable reader would construe '**you**' to have the meaning assigned to 'you.' They are the same words, but they are, in effect, different terms." (citations omitted)); *State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 388 (Colo. 1997) (en banc) ("In contrast, 'pedestrian' as used in the anti-stacking provision within the UM coverage section is not in bold italic typeface. Such contrast indicates that the parties only intended the technical definition of 'pedestrian' to apply in the No-Fault section where it does appear in bold italics, and its ordinary meaning to apply in the UM section."); *Silverman v. Econ. Fire & Cas. Co.*, 650 N.E.2d 603, 605 (Ill. App. Ct. 1995) ("We reject Economy's argument that 'loss' has the same meaning everywhere it appears in the policy, boldface type or not. The policy carefully and sensibly limits the applicability of the defined '**loss**.'"); *see also* Antonin Scalia and Brian A.

6

Garner, *Reading Law: The Interpretation of Legal Texts* 225–27 (2012) (advising that "[d]efinition sections and interpretation clauses are to be carefully followed," and observing that "text-specific definitions" ordinarily are applied "with rigor"). But at least one court has concluded that this distinction in meaning is not so obvious:

> [W]here a term that is defined by the policy when appearing in bold face type appears in another face type . . . the term is ambiguous because it might be read to be defined as it would be if in bold face type, or it might be read to be defined in the way it is in common usage.

*City of Boise v. Planet Ins. Co.*, 878 P.2d 750, 754 (Idaho 1994).

Auto-Owners asserts several arguments to support its position that "**insured**" and "insured" unambiguously mean the same thing, and that, as a result, J.M. falls within the policy's intra-insured exclusion. It argues that the two explanatory sentences preceding the policy's definitions establish that it intended every use of the word "insured" in the policy to appear in bold text, that it "simply chose to employ bold face type as a matter of courtesy and convenience" to its policyholders, and that its failure to do so with respect to the intra-insured exclusion was a "typographical error resulting in the omission of this courtesy bolding in one instance." Mem. in Opp'n at 6–9. Auto-Owners does not offer extrinsic evidence to substantiate these assertions. Its argument depends entirely on the policy and especially on the two sentences at the beginning of the **DEFINITIONS** section: "To understand this policy, **you** must understand the meaning of the following words. These words appear in **bold face type** whenever used in this policy and endorsements attached to this policy." Policy at 14. Auto-Owners argues the policy's "use of the singular phrase 'the meaning' . . . indicates that each of the words to be defined below has a single

7

meaning" and that the wording of "whenever used" in the second sentence does not "suggest that the meaning of each defined word is contingent on the word appearing in bold face type." Mem. in Opp'n at 7.

These arguments do not establish that Auto-Owners' interpretation is the only reasonable interpretation of the policy or, put another way, that the policy reasonably may be interpreted only to deny coverage for J.M.'s claim. Perhaps it would be reasonable to understand the phrase "[t]hese words appear in **bold face type** whenever used in this policy" to express an intent that each specially-defined word appear in "**bold face type**," Policy at 14, at all times in the policy. Perhaps some policyholders would conclude that words assigned special meaning in the **DEFINITIONS** section but appearing in plain text reflect typographical mistakes by Auto-Owners. Under this interpretation, a hypothetical policyholder might conclude that the word "insured" in the policy's intra-insured exclusion should be interpreted as if it appeared in bold text, and that would mean J.M.'s claim is not covered. That is not, however, the only reasonable interpretation of the phrase "[t]hese words appear in **bold face type** whenever used in this policy." Policy at 14. The point of the two sentences preceding the **DEFINITIONS** is to alert policyholders to the fact that "words appear[ing] in **bold face type**," have special meaning. *Id*. With that qualifier, a policyholder might reasonably think that the two sentences and the **DEFINITIONS** section as a whole do not say anything about the meaning of words not in bold text. Also, the word "used" in the second sentence need not—and really should not—be understood to mean "appear." The words have different meanings. Relevant to interpreting the policy, "use" means "[t]o put into service or apply for a purpose; employ." *The American Heritage*

8

*Dictionary of the English Language* 1894 (4th ed. 2000). "Appear" means "[t]o become visible." *Id.* at 86. A reasonable policyholder would understand that Auto-Owners "uses" or "employs" words in bold text to denote specialized meaning. A reasonable policyholder would not necessarily anticipate that the mere appearance of the same words in plain text signals the same specialized usage.

Some of Auto-Owners' arguments are not tenable. The policy says nothing to suggest that Auto-Owners' use of bold text is intended "as a matter of courtesy and convenience." *See* Mem. in Opp'n at 8. To the contrary, the first of the two sentences on which Auto-Owners relies reads as an imperative command: a policyholder "must understand" the meaning of words in "**bold face type**" to understand the policy. Policy at 14. Nor does the policy say anything about the possibility of typographical errors or how they are to be resolved.

The point of Auto-Owners' assertion that the appearance of "insured" in plain text in the Kammerers' homeowners policy is "one instance" of a mistake is not clear. Mem. in Opp'n at 8. If Auto-Owners intends to refer to other policies, there is no evidence showing that similar policies that Auto-Owners issued to others do or do not contain the same asserted error. If Auto-Owners means to say that the word "insured" appears in plain text in only "one instance" in the Kammerers' policy, that is not correct. The term appears in plain text twice in the policy's declarations (albeit in capital letters), Policy at 9–10, and in definition seventeen, *id.* at 16 ("**17. You** or **your** means the first named insured shown in the Declarations and if an individual, **your** spouse who resides in the same household."). The fact that "insured" appears in the policy multiple times in plain text undermines

Auto-Owners' argument that its appearance in plain text in the intra-insured exclusion was inadvertent.

Auto-Owners also argues that "Minnesota Law supports treating [J.M.] as an insured or a keeper of the dogs under [the] circumstances" of this case. Mem. in Opp'n at 9. To support this contention, Auto-Owners cites a Minnesota statute that imposes liability on dog owners for injuries caused by dogs. *Id.* The statute reads:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term "owner" includes any person harboring or keeping a dog but the owner shall be primarily liable. The term "dog" includes both male and female of the canine species.

Minn. Stat. § 347.22. In the same section of its brief, Auto-Owners also cites two cases—one from the Court of Appeals of Wisconsin and the other from the Supreme Court of Nebraska—that Auto-Owners asserts "persuasively found no coverage in factually similar situations." Mem. in Opp'n at 10–11.

Neither the Minnesota statute nor the cases Auto-Owners cites justifies the conclusion that J.M. is an "insured" for purposes of the intra-insured exclusion. Auto-Owners is correct that J.M.'s acceptance of temporary responsibility for the care of the Kammerers' dogs would seem to justify a finding that she was "harboring or keeping" them within the meaning of Minn. Stat. § 347.22. *See Carlson v. Friday*, 694 N.W.2d 828, 831 (Minn. Ct. App. 2005). But the statute doesn't say anything about insurance coverage. It is true, as a practical matter, that dog owners and others who harbor or keep dogs might be wise to purchase insurance coverage in view of the scope of liability created by the

statute, but that observation says nothing about the scope of the policy's coverage in this case. The two cases Auto-Owners cites are also distinguishable. Though both cases address insurance coverage for dog-bite injuries sustained by dog-sitters, the policies at issue used "**insured**" in bold text in both their personal-liability coverage provisions and their intra-insured exclusions. *Van Kleek v. Farmers Ins. Exch.*, 857 N.W.2d 297, 300 (Neb. 2014); *Malik v. Am. Family Mut. Ins. Co.*, 625 N.W.2d 640, 643 (Wis. Ct. App. 2001).

Because the specialized definition the policy gives to "**insured**" reasonably may be understood not to apply also to "insured," it is necessary to define the latter term. Under Minnesota law, words not defined in an insurance policy must be given their plain and ordinary meaning. *Walker v. State Farm Fire & Cas. Co.*, 569 N.W.2d 542, 544 (Minn. Ct. App. 1997). Though "insured" may be ambiguous depending on context, *Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 687 (Minn. 2018), one ordinary meaning of the term "insured" is "the person who applies for the insurance, who is named in the policy as the insured and who pays the premium," *Fire Ins. Exch. v. Adamson Motors*, 514 N.W.2d 807, 809 (Minn. Ct. App. 1994) (quoting *Kierce v. Lumbermen's Ins. Co.*, 202 N.W. 730, 731 (Minn. 1925)); *Dollansky*, 919 N.W.2d at 687 (quoting Webster's Dictionary, which defines "insured" as "the owner of a policy of insurance: policyholder"). Here, it is at least reasonable to understand the word "insured" appearing in plain text to mean just that: the named insured or policyholder. Doing so gives distinct meaning to "**insured**" and "insured," thus avoiding surplusage. *See State v. Nelson*, 842 N.W.2d 433, 439 n.4 ("[T]he canon against surplusage . . . favors that interpretation which *avoids*

surplusage." (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012))). And here, there can be no doubt the Kammerers—and not J.M.—are the named insureds and policyholders. They applied for the insurance and paid the premium, or at least there is no suggestion otherwise. The first page of the policy's declarations names the Kammerers as "INSURED." Policy at 9. On the second page of the declarations, only Laura Kammerer is named as "INSURED." *Id.* at 10. Either way, the declarations don't mention J.M.

Auto-Owners identifies no unreasonable results that might flow from interpreting "insured" in the intra-insured exclusion differently from "**insured**" as it is defined and used elsewhere in the policy. This is not a case, then, where the "obvious purpose of the contract as a whole" shows that the ambiguity apparent from Auto-Owners use of bold and plain text is in fact nonexistent. *See Miller v. ACE USA*, 261 F. Supp.2d 1130, 1137 (D. Minn. 2003) (quoting *Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. Ct. App. 1987)). And it is not difficult to identify—at least hypothetically—a reason why Auto-Owners might purposefully have chosen not to subject an "**insured**" like J.M. to the intra-insured exclusion. The "**Personal Liability**" exclusion applicable to insureds has no limits. It does not say that its scope is coterminous with the provision making J.M. an "**insured**" while legally responsible for the Kammerers' dogs. In other words, if J.M. were an "insured" for purposes of the exclusion, then she would be excluded entirely from the Policy's coverage, certainly while engaged in the dog-sitting activities that made her an "**insured**." Hypothetically, that would mean there would be no coverage if, for example, one of the Kammerers ran J.M. over with a car while she was caring for their dogs. It seems sensible that an insurer might intend to provide coverage in that kind of situation.

D

To summarize, the word "insured" reasonably may be understood to have different meanings in the policy depending on whether the word appears in bold or plain text. For purposes of the policy's intra-insured exclusion specifically, "insured" reasonably may be understood not to refer to J.M. Auto-Owners' theory of the case—that the word unambiguously has the same meaning regardless of whether it appears in bold or plain text—is incorrect, and its complaint for declaratory relief based on its interpretation of the policy is therefore implausible and must be dismissed.

## ORDER

Based upon all of the files, records, and proceedings in the above-captioned matter, **IT IS HEREBY ORDERED** that:

1. The Motion to Dismiss [ECF No. 13] is **GRANTED**; and

2. The Complaint [ECF No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: April 26, 2019                        s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court